**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**CIVIL CASE NOS. 1:22-cv-00028-MR-WCM, 1:22-cv-00029-MR-WCM,**
**1:22-cv-00030-MR-WCM, 1:22-cv-00031-MR-WCM, 1:22-cv-00032-MR-WCM, 1:22-cv-00033-MR-WCM, 1:22-cv-00034-MR-WCM, 1:22-cv-00035-MR-WCM, 1:22-cv-00036-MR-WCM, 1:22-cv-00037-MR-WCM**

| | | |
|---|---|---|
| **DARRYL K. MCMAHAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **AMENDED** |
| | ) | **MEMORANDUM OF** |
| **LOWELL S. GRIFFIN, WESTERN** | ) | **DECISION AND ORDER** |
| **SURETY COMPANY, and KENNETH** | ) | |
| **B. CLAMSER,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Defendants' Motions for Summary Judgment. [Case Nos. 1:22-cv-00028-MR-WCM, Doc. 29; 1:22-cv-00029-MR-WCM, Doc. 24; 1:22-cv-00030-MR-WCM, Doc. 24; 1:22-cv-00031-MR-WCM, Doc. 23; 1:22-cv-00032-MR-WCM, Doc. 23; 1:22-cv-00033-MR-WCM, Doc. 23; 1:22-cv-00034-MR-WCM, Doc. 23; 1:22-cv-00035-MR-WCM, Doc. 23; 1:22-cv-00036-MR-WCM, Doc. 23; 1:22-cv-00037-MR-WCM, Doc. 23].

# I.     PROCEDURAL BACKGROUND

These civil actions involve federal claims for violations of 42 U.S.C. § 1983 and state law claims of malicious prosecution, abuse of process, and negligence arising from the arrest of the Plaintiff Darryl K. McMahan ("McMahan") on charges of obtaining property by false pretenses after he failed to deliver gravestone markers and similar items to a number of customers.[1]    McMahan owns and operates Custom Monuments, Inc. ("Custom Monuments"), formerly known as McMahan Memorials, Inc., a company involved in the production and installation of granite and bronze monuments and signs.

McMahan filed these ten civil actions in North Carolina state court against Lowell S. Griffin, in his capacity as Sheriff of Henderson County ("Sheriff Griffin"); Western Surety Company, as surety for the Sheriff ("Western Surety"); and Henderson County Sheriff's Deputy Kenneth B. Clamser ("Deputy Clamser") (collectively, "Defendants").    The Defendants removed each of these actions to this Court, alleging federal question

---

[1] In addition to the ten civil actions discussed in this Order, McMahan subsequently filed twenty other similar actions, which were all removed to this Court as well.  Given the timing of the filing of these latter actions, they are not yet ripe for adjudication.

jurisdiction pursuant to 28 U.S.C. § 1331. Thereafter, the Defendants filed their Answers to the respective Complaints.

Upon motion of the Defendants, the Magistrate Judge consolidated these actions for discovery. Upon the completion of discovery, the Defendants moved to consolidate these cases for the purpose of filing dispositive motions, which McMahan opposed. On December 7, 2022, the Magistrate Judge granted in part the motion to consolidate, ordering the parties to file a consolidated memorandum of law in support of any and all motions for summary judgment in the ten cases and a separate brief applying the law to the facts in each of the cases. The consolidated memorandum of law was to be filed in the earliest-filed case, 1:22-cv-00028, and the fact-specific briefs were to be filed respectively in the other cases.

On December 21, 2022, the Defendants filed a motion for summary judgment in each of the cases, as well as a consolidated memorandum of law and a fact-specific memorandum in support of each motion. On January 17, 2023, McMahan filed a consolidated memorandum of law in opposition to each motion for summary judgment and a fact-specific memorandum in opposition applying the relevant law to the facts of this case [Doc. 34]. On January 21, 2023, the Defendants filed a reply to McMahan's consolidated memorandum of law in opposition and a reply to McMahan's fact-specific

3

memorandum. Thus, these matters have been fully briefed and are now ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers, admissions, stipulations, affidavits, and other materials on the record show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)&(c). "As the Supreme Court has observed, 'this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).

"Facts are material when they might affect the outcome of the case, and a genuine issue exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." Ballengee v. CBS Broad., Inc., 968 F.3d 344, 349 (4th Cir. 2020) (quoting News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010)). The Court does not make credibility determinations or weigh the evidence when ruling on a motion for summary judgment. Guessous v. Fairview Prop. Invs., LLC,

4

828 F.3d 208, 216 (4th Cir. 2016). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat, 346 F.3d at 522. If this showing is made, the burden then shifts to the nonmoving party who must convince the Court that a triable issue does exist. Id.

In considering the facts on a motion for summary judgment, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor. Smith v. Collins, 964 F.3d 266, 274 (4th Cir. 2020).

## III. FACTUAL BACKGROUND

Viewing the forecast of evidence in the light most favorable to McMahan, the facts are as follows.

Beginning in the spring of 2019, deputies at the Henderson County Sheriff's Office began receiving reports from customers of Custom Monuments, complaining that they had paid for but not received a gravestone marker or similar item from McMahan's business. These calls only increased after a local news station broadcast a story about one of McMahan's customers who had paid for, but had not received, a gravestone monument. [Case No. 1:22-cv-29, Doc. 25-4: Clamser Dep. at 22-23].

After receiving numerous complaints about McMahan's business practices, Deputy Clamser. who was the Henderson County Sheriff's Property Crimes Supervisor, began seeking to bring charges against McMahan. In Deputy Clamser's view, "one time is a mistake. Multiple times is a pattern." [Case No. 1:22-cv-29, Doc. 25-4: Clamser Dep. at 60].

The present civil actions represent ten of these criminal charges, each involving a different customer transaction. While the charges were brought at different times, they were ultimately all dismissed in August and September 2020 pursuant to an agreement arranged by McMahan's defense attorney. The following is a summary of the undisputed facts related to these transactions and the subsequent criminal investigation and prosecution of each.

## A.    Susan Roberts (Case No. 1:22cv28)

On November 18, 2018, Custom Monuments entered into a contract with Susan Roberts ("Roberts") for the production of a gravestone monument for Roberts's late husband. [Case No. 1:22cv28, Doc. 34-12: Roberts Contract at 2]. The contract provided an estimated completion time of twenty to twenty-four weeks. [Id.]. The contract noted a "cemetery fee" of $665.24 and a "net fee" of $2,395.00. [Id.]. Next to the cemetery fee amount, there was a handwritten notation that "customer will pay." [Id.]. Under these

monetary amounts, there was a handwritten notation of "paid in full." [Id.]. The contract, like all of the contracts at issue in the present cases, also included a disclaimer that "[t]his contract is subject to delays occasioned by fire, accident, strikes, inclement weather or other causes beyond the control of the company" (hereinafter "the standard disclaimer"). [Id.]. McMahan's signature appeared on the contract. [Id.].

McMahan submitted an order to Excel Granites, Inc. ("Excel Granites"), for the monument, and Excel Granites prepared a proof of the design, which Roberts signed. [Case No. 1:22cv28, Doc. 34-14: Roberts Proof]. On May 29, 2019, McMahan texted Roberts's daughter, Kayla Hall ("Hall"), stating: "Stone is ready. I'm short on help. My Nephew's wife had a major surgical procedure and he is out till next Monday. I have no one else to fill in." [Case No. 1:22cv28, Doc. 34-15: Hall Texts at 13]. Hall responded to ask when the monument would be set, but McMahan did not respond. [Id.]. Hall texted on several subsequent days to ask when the monument could be set and to ask for updates, noting that she had called Custom Monuments' office and received no answer. [Id. at 14]. On June 11, 2019, McMahan replied, stating: "I had an accident and was in the hospital for a while today." [Id.]. On June 17, 2019, McMahan texted Hall a photo of the completed monument but informed her that he was still "working on" procuring the foundation cover

7

for the monument. [Id. at 17-18]. On July 3, 2019, Hall told McMahan that she wanted the monument set "ASAP" and was not "getting any answers" from McMahan or Custom Monuments. [Id. at 19]. McMahan replied that he was still hospitalized and that all of his employees were on vacation. [Id.]. On July 22, 2019, Hall texted McMahan saying: "I been [sic] trying to reach out to you and your company with no answer and phones disconnected. Weeks ago I was told everything was ready it just needed to be picked up. Dads stone needs to be set." [Id. at 21]. McMahan did not reply to this message and the text message records do not show further correspondence between the two.[2] [Id.].

On July 25, 2019, Hall met with Henderson County Sheriff's Deputy Brittany Owen ("Deputy Owen") and reported that Roberts had not received the monument she had ordered from Custom Monuments. [Case No. 1:22cv28, Doc. 31-3: Owen Dep. at 15]. Hall gave Deputy Owen a copy of the Custom Monuments contract but did not provide her with any photographs of the completed monument. [Id. at 15-16]. Deputy Owen did

---

[2] At some point in the spring of 2019, McMahan learned from Blue Ridge Gardens of Memory, where Roberts's gravestone was to be placed, that Roberts had not paid the cemetery fee. [Case No. 1:22cv28, Doc. 31-6: McMahan Dep. at 102]. However, his texts with Hall do not reflect that he mentioned the cemetery fee to her or cited the unpaid fee as a barrier to the monument's installation.

not ask Hall if there was a reason for the delay in the monument delivery, nor did the two discuss whether the cemetery fee had been paid. [Case No. 1:22cv28, Doc. 34-4: Owen Dep. at 19-20]. Deputy Owen prepared an intake report based on this conversation but did not perform any follow-up investigation. [Id. at 21].

On July 30, 2019, Deputy Roger Aly ("Deputy Aly") contacted Roberts to investigate Deputy Owen's report. [Case No. 1:22cv28, Doc. 31-4: Aly Dep. at 10-11]. Roberts told Deputy Aly that her last contact with McMahan's company was with the office manager, who she felt had just made excuses, and that she had since made ten to fifteen attempts to contact Custom Monuments regarding when the monument would be ready but had not received an answer. [Id. at 11]. Roberts also told Deputy Aly that she had been informed that "the stone was ready but the base was delayed" and sent Deputy Aly a photo she received of the stone. [Case No. 1:22cv28, Doc. 34-5: Aly Dep. at 11].

Deputy Aly provided this information to Deputy Clamser. [Id. at 12-13]. Deputy Clamser did not attempt to contact McMahan regarding these allegations. [Case No. 1:22cv28, Doc. 34-6: Clamser Dep. at 66]. Deputy Clamser also did not attempt to contact the cemetery at which the monument was to be placed. [Case No. 1:22cv28, Doc. 31-5: Clamser Dep. at 71].

9

On July 31, 2019, Deputy Clamser sought an arrest warrant from Magistrate Susan Oates ("Magistrate Oates"). [Id. at 66]. Deputy Clamser informed Magistrate Oates that Roberts paid McMahan $2,395 for a gravestone memorial that was never delivered. [Case No. 1:22cv28, Doc. 31-7: Oates Dep. at 13]. Deputy Clamser also informed her that Roberts had tried to get in touch with McMahan and had not gotten a response. [Id.]. Based on the information provided, Magistrate Oates issued an arrest warrant for McMahan, charging him with obtaining property by false pretenses in violation of North Carolina General Statute § 14-100.[3] [Case No. 1:22cv28, Doc. 34-17: Arrest Warrant].

On August 8, 2019, McMahan was arrested on the charge at issue in this case as well as charges in three similar cases. [Case No. 1:22cv28, Doc. 31-6: McMahan Dep. at 306-07]. After his arrest, McMahan contacted the cemetery and requested written documentation that the cemetery fee had not been paid. [Id.]. On August 13, 2019, McMahan received a letter confirming that the cemetery fees at Blue Ridge Gardens of Memory had not

---

[3] Under § 14-100, a person commits the crime of obtaining property by false pretenses if he "knowingly and designedly by means of any kind of false pretense whatsoever, whether the false pretense is of a past or subsisting fact or of a future fulfillment or event, obtain[s] or attempt[s] to obtain from any person within this State any money, goods, property, services, chose in action, or other thing of value with intent to cheat or defraud any person of such money, goods, property, services, chose in action or other thing of value." N.C. Gen. Stat. § 14-100(a).

10

been paid and stating that the monument could not be installed until such fees were paid in full. [Case No. 1:22cv28, Doc. 34-18: Blue Ridge Gardens Letter].

In August 2020, one of Roberts's family members made an arrangement with Blue Ridge Gardens to pay the cemetery fee, and the monument was installed. [Case No. 1:22cv28, Doc. 34-11: McMahan Decl. at ¶ 15]. On August 14, 2020, the charge at issue in this case was dismissed pursuant to an agreement arranged by McMahan's defense attorney. [Case No. 1:22cv28, Doc. 34-19: Dismissal Record; Case No. 1:22cv28, Doc. 36-3: McMahan Dep. at 305-06]. As part of the agreement, McMahan submitted a form signed by Roberts confirming the monument had been delivered and indicating that she agreed to have the charge dismissed. [Case No. 1:22cv28, Doc. 36-3: McMahan Dep. at 305-06].

### B. Irene McMinn (Case No. 1:22cv29)

On October 10, 2018, Custom Monuments entered into a contract with Irene McMinn ("McMinn") for the production of a bronze grave marker. [Case No. 1:22cv29, Doc. 27-11: McMinn contract at 2]. The contract provided an estimated completion time of sixteen to twenty weeks. [Id.]. The contract stated a total cost of $1,495.00 and included a "paid" notation. [Id.]. The contract included the standard disclaimer language and was signed by

11

McMahan.  [Id.].  As the marker was for a U.S. military marker, McMahan and McMinn also completed a Department of Veteran's Affairs form (the "VA form"), requesting authorization for a government marker.  [Case No. 1:22cv29, Doc. 27-12: VA Form].

On November 1, 2018, McMahan placed an order with Granit Bronz for the production of the marker.  [Case No. 1:22cv29, Doc. 27-13: Granit Bronz Order Form].  On December 17, 2018, McMinn signed a proof of the marker.  [Case No. 1:22cv29, Doc. 27-14: signed proof].

McMahan contacted[4] Shepherd's Memorial Park ("Shepherd's Park"), the cemetery where the marker was to be placed.  [Case No. 1:22cv29, Doc. 27-3: McMahan Dep. at 103-04].  McMahan learned from Shepherd's Park that the cemetery was no longer allowing "duplicate" markers, or markers meant to mark the gravesites of two people, like the marker ordered by McMinn.  [Id. at 104].  McMahan informed McMinn about this policy change but told her he would "work on it."  [Id. at 104-05].  McMahan contacted the owner of Shepherd's Park, but she refused to speak with him.  [Id. at 105].

---

[4] The record does not reflect when McMahan first spoke with Shepherd's Park about McMinn's marker.

McMahan also verbally complained about the policy to the North Carolina Cemetery Commission. [Id.].

McMahan had also not yet received the bronze marker from Granit Bronz, so he contacted the company and learned that the marker had been mistakenly sent to a prior business address. [Id. at 107-08]. However, when McMahan contacted the new tenants at that address, he was informed that they had not received the marker. [Id. at 108].

On March 26, 2019,[5] McMinn contacted Henderson County Sheriff's Deputy Terry Patterson ("Deputy Patterson") and informed him that she paid McMahan for a grave marker in December but had not received the marker and that McMahan was not returning her calls about her order. [Case No. 1:22cv29, Doc. 27-4: Patterson Report at 5; Case No. 1:22cv29, Doc. 27-4: Patterson Dep. at 27]. On April 17, 2019, Deputy Clamser contacted McMinn regarding Deputy Patterson's report but did not learn any more from her than what she had originally reported to Deputy Patterson. [Case No. 1:22cv29, Doc. 27-5: Clamser Dep. at 29-31]. Deputy Clamser, who noted in his report

---

[5] In his deposition, Deputy Patterson testified that McMinn first spoke with him on December 17, 2018. [Case No. 1:22cv29, Doc. 27-4: Patterson Dep. at 27]. However, his report is dated March 26, 2019, with an incident date of December 17, 2018. [Doc. 27-4: Patterson Report at 5]. In his deposition, Deputy Clamser confirmed that the report was made on March 26, 2019. [Case No. 1:22cv29, Doc. 27-5: Clamser Dep. at 29-30].

that this was the third case he had investigated regarding Custom Monuments, contacted McMahan[6] who informed him that "this was nothing more than a civil matter" and cited Shepherd's Park as the "roadblock" to fulfilling the contract. [Id. at 31-32; Case No. 1:22cv29, Doc. 25-4: Clamser Report at 14]. Deputy Clamser also contacted Shepherd's Park and spoke with an employee who claimed the cemetery had nothing to do with the delay. [Case No. 1:22cv29, Doc. 25-4: Clamser Dep. at 34]. Several weeks later, Deputy Clamser called McMahan again and inquired about the status of the marker. [Case No. 1:22cv29, Doc. 25-5: McMahan Dep. at 71]. McMahan informed Deputy Clamser that he was still working on McMinn's order and that he had run into "roadblocks." [Id.]. Deputy Clamser then noted in his report that "[a]t this point case will be closed due to no crime has been committed just bad business practices." [Case No. 1:22cv29, Doc. 27-5: Clamser Report at 13]. On June 1, 2019, McMinn called Deputy Clamser and informed him that she still had not received the marker. [Id.]. At this point, Deputy Clamser contacted an assistant district attorney who declined

---

[6] The Plaintiff's Response to the Defendants' Interrogatories places the time of this call in "about February 2019." [Case No. 1:22cv29, Doc. 27-2 at 3]. However, because of the date of McMinn's initial report, this appears to be a mistake or misestimation.

to prosecute the matter. [Case No. 1:22cv29, Doc. 25-4: Clamser Dep. at 22].

On June 7, 2019, McMahan refunded McMinn because of the delay in delivery and because of the Shepherd's Park policy. [Case No. 1:22cv29, Doc. 27-2: Plaintiff's Responses to Interrogatories at 3]. On July 15, 2019, McMinn contacted Deputy Clamser and informed him that she had received a refund. [Case No. 1:22cv29, Doc. 27-5: Clamser Report at 14].

On August 1, 2019, Deputy Clamser testified before Magistrate Monica Jernigan ("Magistrate Jernigan"). [Case No. 1:22cv29, Doc. 27-18: Arrest Warrant]. He informed her that McMinn paid McMahan for a gravesite marker and that she had not received the marker. [Case No. 1:22cv29, Doc. 25-6: Jernigan Dep. at 11]. Deputy Clamser did not inform Magistrate Jernigan that there had been an issue with the Shepherd's Park policy because he felt that this was irrelevant to the case. [Case No. 1:22cv229, Doc. 27-5: Clamser Dep. at 53, 54, 55]. He further could not recall if he advised the magistrate that McMinn had already received a refund. [Id. at 57, 58]. Based on the information provided, Magistrate Jernigan issued an arrest warrant for McMahan, charging him with obtaining property by false pretenses in violation of North Carolina General Statute § 14-100. [Case No. 1:22cv29, Doc. 27-18: Arrest Warrant]. In her subsequent deposition,

15

however, Magistrate Jernigan testified that she would have made a different decision if she had been told about a problem with the installation at Shepherd's Park and that McMinn's money had been refunded. [Case No. 1:22cv29, Doc. 27-6: Jernigan Dep. at 17-18].

On August 8, 2019, McMahan was arrested on the charge at issue in this case as well as charges in three similar cases. [Case No. 1:22cv29, Doc. 25-5: McMahan Dep. at 307]. On August 14, 2020, the charge at issue in this case was dismissed pursuant to an agreement arranged by McMahan's defense attorney. [Case No. 1:22cv29, Doc. 27-19: Dismissal Record; Doc. 25-5: McMahan Dep. at 306]. As part of the agreement, McMahan submitted a form signed by McMinn indicating that she agreed to have the charge dismissed. [Case No. 1:22cv29, Doc. 25-5: McMahan Dep. at 306].

### C. Wanda Payne (Case No. 1:22cv30)

On April 11, 2019, Custom Monuments entered into a contract with Wanda Payne ("Payne") to engrave a stone monument. [Case No. 1:22cv30, Doc. 27-12: Payne Contract at 2]. Specifically, Payne was to provide McMahan with a field rock from her property and he was to have it engraved. [Case No. 1:22cv30, Doc. 27-3: McMahan Dep. at 112]. The contract provided an estimated completion time of eight to ten weeks. [Case No.

16

1:22cv30, Doc. 27-12: Payne Contract at 2]. The contract stated a total cost of $495.00 and included a "paid in full" notation. [Id.]. The contract included the standard disclaimer and was signed by McMahan. [Id.].

In late May 2019, McMahan delivered the field stone to Faith Customized Monuments in Georgia so that it could be engraved. [Case No. 1:22cv30, Doc. 27-2: Plaintiff's Responses to Interrogatories at 2]. However, Faith Customized Monuments informed McMahan that they would be unable to engrave the stone because they were worried about damaging it. [Id.]. In mid-July 2019, McMahan retrieved the stone from Faith Customized Monuments. [Id.]. McMahan informed Payne[7] that Faith Customized Monuments was unable to complete the engraving but assured her he would "get the problem fixed." [Id.].

On July 27, 2019, Payne contacted the Henderson County Sherriff's Department and spoke with Deputy Jose Jimenez ("Deputy Jimenez"). [Case No. 1:22cv30, Doc. 27-5: Jimenez Dep. at 9]. Payne informed Deputy

---

[7] The record does not reflect when McMahan contacted Payne with this information. In his deposition, he stated that he informed her that Faith Customized Monuments could not engrave the stone "somewhere toward the third or four [sic] week of May." [Doc. 27-3: McMahan Dep. at 117]. In his Responses to the Defendants' Interrogatories, however, McMahan states that he did not deliver the stone to Faith Customized Monuments until late May and indicates that he first informed Payne that Faith Customized Monuments would be unable to engrave the stone after he had already retrieved the stone in mid-July. [Doc. 27-2: Plaintiff's Responses to Interrogatories at 2].

Jimenez that she had provided McMahan with a field stone and paid him $495 to have the stone engraved but had not received the finished stone within the time frame anticipated in her contract. [Case No. 1:22cv30, Doc. 27-5: Payne Investigation Rep. at 6]. Payne also informed Deputy Jimenez that she had made multiple attempts to contact McMahan for a status update but had been unable to reach him. [Id.].

Deputy Clamser instructed Deputy Travis Pierce ("Deputy Pierce") to follow up with Payne. [Case No. 1:22cv30, Doc. 27-4: Clamser Dep. at 91]. Deputy Clamser asked Deputy Pierce to ask Payne five specific questions. [Id.]. On August 5, 2019, Deputy Pierce called Payne and asked her the questions as instructed. [Doc. 27-6: Pierce Dep. at 19]. Specifically, Deputy Pierce asked Payne: "(1) How many calls did you make to Custom Monuments?; (2) How many return calls did you receive from Darryl McMahan?; (3) What was his excuse?; (4) What was your method of payment?; and (5) did he offer/ or make things right?" [Case No. 1:22cv30, Doc. 27-6: Payne Investigation Rep. at 11-12]. In response, Payne said that she had made a dozen calls to Custom Monuments and received no return calls from McMahan. [Id.]. She noted that McMahan had informed her that he was "behind due to the wet weather"; however, it is unclear when she received that explanation. [Id.]. Payne also told Deputy Pierce that she paid

McMahan with a personal check and that McMahan had not offered to "make things right." [Id.]. In the report he made of that call, Deputy Pierce wrote that Payne would mail him a copy of the contract with Custom Monuments and a copy of the check; however, Deputy Pierce testified in his deposition that he was unsure if the Sheriff's Department ever received those documents. [Id.].

Deputy Clamser reviewed the reports of Deputies Jimenez and Pierce and, on August 6, 2019, testified in front of Magistrate Brenda Ray ("Magistrate Ray") regarding Payne's allegations. [Case No. 1:22cv30, Doc. 27-4: Clamser Dep. at 90]. Deputy Clamser testified about Payne's initial report that she had not received an engraved stone within the anticipated time frame and about Payne's answers to the five questions posed by Deputy Pierce. [Case No. 1:22cv30, Doc. 25-5: Clamser Dep. at 123-24, 173]. Based on the information provided, Magistrate Ray issued an arrest warrant for McMahan, charging him with obtaining property by false pretenses in violation of North Carolina General Statute § 14-100. [Case No. 1:22cv30, Doc. 27-14: Arrest Warrant]. The warrant reads: "The false pretense consisted of the following: Purchased a grave stone/monument that was never delivered, nor money refunded or telephone calls returned to victim." [Id.].

19

On August 8, 2019, McMahan was arrested on the charge at issue in this case as well as charges in three similar cases. [Case No. 1:22cv30, Doc. 25-6: McMahan Dep. at 307]. At some point after August 6, 2019, McMahan brought the stone to another engraving company and was able to have the stone engraved and installed. [Case No. 1:22cv30, Doc. 27-2: Plaintiff's Responses to Interrogatories at 3]. On September 6, 2019, Payne called the Sheriff's Department and stated that she had received the engraved stone. [Case No. 1:22cv30, Doc. 27-4: Clamser Dep. at 96]. On December 8, 2020, the charge at issue in this case was dismissed pursuant to an agreement arranged by McMahan's defense attorney. [Case No. 1:22cv30, Doc. 27-16: Dismissal Record; Case No. 1:22cv30, Doc. 25-6: McMahan Dep. at 141]. As part of the agreement, McMahan submitted a form signed by Payne indicating that she agreed to have the charge dismissed. [Case No. 1:22cv30, Doc. 25-6: McMahan Dep. at 306].

### D.    Sherri Freeman (Case No. 1:22cv31)

On November 28, 2017, Custom Monuments entered into a contract with Sherri Freeman ("Freeman") to produce two headstones, one for Freeman and one for her late husband. [Case No. 1:22cv31, Doc. 26-12: Freeman Contract at 2-3]. Each headstone was to have a dachshund engraving. [Id.]. The contract provided an estimated completion time of

twelve to sixteen weeks.  [Id.].  The contract stated a cost of $346.93 for each headstone and included a "paid" notation for each.  [Id.].  The contract also included the standard disclaimer.  [Id.].

Also on November 28, 2017, Custom Monuments prepared an order form for the headstones, and on December 1, 2017, Custom Monuments faxed the order form to Faith Customized Monuments.  [Case No. 1:22cv31, Doc. 26-13: Faith Monuments Order Form; Case No. 1:22cv31, Doc. 26-14: Order Form Fax Confirmation].   In February 2018, Faith Customized Monuments sent Custom Monuments proofs of the headstones, which Custom Monuments then provided to Freeman.  [Case No. 1:22cv31, Doc. 26-11: McMahan Decl. at ¶ 6; Case No. 1:22cv31, Doc. 26-15: Headstone Proofs].    Freeman provided Custom Monuments with an image of a dachshund head that she preferred to the one on the proof, and Custom Monuments sent that image to Faith Customized Monuments in February 2018.  [Case No. 1:22cv31, Doc. 26-11: McMahan Decl. at ¶¶ 8-9; Doc. 26-16: Dachshund Head Image].  Freeman also sent Custom Monuments a full-body dachshund image, and Custom Monuments faxed that image to Faith Customized Monuments in May 2018.[8]  [Case No. 1:22cv31, Doc. 26-11:

---

[8] The record does not reflect when Custom Monuments received the full-body dachshund image from Freeman.

21

McMahan Decl. at ¶ 10-12; Doc. 26-17: Dachshund Full-Body Image; Case No. 1:22cv31, Doc. 26-18: May Fax Confirmation]. However, Custom Monuments learned from Faith Customized Monuments that the size of the gravestone would not accommodate the full-body dachshund image. [Case No. 1:22cv31, Doc. 26-2: Plaintiff's Responses to Interrogatories at 2]. Freeman approved the final gravestone proof on May 10, 2018, and sent the approved proofs to Faith Customized Monuments. [Id.].

In either October 2018 or spring 2019,[9] McMahan retrieved the completed gravestones from Faith Customized Monuments.[10] [Case No. 1:22cv31, Doc. 26-2: Plaintiff's Responses to Interrogatories at 2; Case No. 1:22cv31, Doc. 26-3: McMahan Dep. at 123-24]. McMahan was not "working

---

[9] In his responses to the Defendants' Interrogatories, McMahan stated that he retrieved the completed gravestones in October 2018. [Case No. 1:22cv31, Doc. 26-2: Plaintiff's Responses to Interrogatories at 2]. However, in his deposition he testified that he retrieved the completed gravestones in Spring 2019. [Case No. 1:22cv31, Doc. 26-3: McMahan Dep. at 123-24].

[10] The record does not reflect whether McMahan or anyone at Custom Monuments contacted Freeman to tell her that the monuments had been completed and picked up from Faith Customized Monuments. In his responses to the Defendants' Interrogatories, McMahan stated that he "spoke with Ms. Freeman and informed her that the monuments had arrived and that it would be best to have them set after the winter cold." [Case No. 1:22cv31, Doc. 26-2: Plaintiff's Responses to Interrogatories at 2]. However, at his deposition, he indicated that only his employees tried to contact Freeman after he picked up the monuments but were unable to reach her. [Case No. 1:22cv31, Doc. 26-3: McMahan Dep. at 123]. McMahan also testified at his deposition that it would be "incorrect" to say that the "issue with Ms. Freeman was winter cold." [Id. at 128].

22

[in] the office much in 2019" and testified that it was his employees'
responsibility to arrange with Freeman to have the gravestones set.  [Case
No. 1:22cv31, Doc. 26-3: McMahan Dep. at 123-24].   His employees
informed him at the time that they were trying to contact Freeman in the
Spring of 2019 but that they were unable to reach her and had to leave
messages.  [Id. at 127].

On July 31, 2019, Freeman contacted the Henderson County Sherriff's
Department and spoke with Deputy Owen.  [Case No. 1:22cv31, Doc. 24-3:
Owen Dep. at 24].  Freeman informed Deputy Owen that she had paid cash
for two gravestones and had received an email finalizing the stones in May
2018.  [Id.].   Freeman also informed Deputy Owen that she met with
McMahan's brother in June 2019 and that the brother "showed her the
contract and it said that the stones were ready to be picked up and installed."
[Id.].  Freeman stated that she had not "heard anything since" and had not
received the monuments.  [Id.].

On August 5, 2019, Deputy Pierce called Freeman to investigate
Deputy Owen's initial report.  [Case No. 1:22cv31, Doc. 24-4: Pierce Dep. at
27].  Freeman told Deputy Pierce that she had made one hundred calls to
Custom Monuments during the preceding year and had only received one
call back from a receptionist.  [Civil Case No. 1:22cv31, Doc. 26-5: Pierce

Investigation Rep. at 9-10]. She also told Deputy Pierce that Custom Monuments gave her the excuse that "[t]he weather was too wet to set stones." [Id. at 10]. Deputy Clamser reviewed Deputy Pierce's report and testified before Magistrate Ray regarding Freeman's allegations on August 6, 2019. [Civil Case No. 1:22cv31, Doc. 26-7: Clamser Dep. at 84]. Deputy Clamser testified about Freeman's initial report that she had not received gravestones for which she had paid and testified about the information Deputy Pierce learned during his investigation. [Civil Case No. 1:22cv31, Doc. 24-5: Clamser Dep. at 123-24, 173].

Based on the information provided, Magistrate Ray issued an arrest warrant for McMahan, charging him with obtaining property by false pretenses in violation of North Carolina General Statute § 14-100. [Civil Case No. 1:22cv31, Doc. 26-19: Arrest Warrant]. The warrant reads: "The false pretense consisted of the following: Victim purchased a grave stone/monument and it was never delivered nor money refunded. Defendant has not returned telephone calls to victim." [Id.].

On August 8, 2019, McMahan was arrested on the charge at issue in this case as well as charges in three similar cases. [Civil Case No. 1:22cv31, Doc. 24-6: McMahan Dep. at 307]. A year later, in August 2020, McMahan spoke with Freeman and installed the two monuments. [Civil Case No.

24

1:22cv31, Doc. 26-2: Plaintiff's Responses to Interrogatories at 2]. On August 14, 2020, the charge at issue in this case was dismissed pursuant to an agreement arranged by McMahan's defense attorney. [Civil Case No. 1:22cv31, Doc. 26-21: Dismissal Record; Civil Case No. 1:22cv31, Doc. 24-6 McMahan Dep. at 141]. As part of the agreement, McMahan submitted a form signed by Freeman indicating that she agreed to have the charge dismissed. [Civil Case No. 1:22cv31, Doc. 26-3: McMahan Dep. at 306].

### E. Sheila Ensley (Case No. 1:22cv32)

On July 28, 2018, Custom Monuments entered into a contract with Sheila Ensley ("Ensley") to produce a gravestone monument. [Case No. 1:22cv32, Doc. 26-11: Ensley Contract at 2]. The contract provided an estimated completion time of sixteen to twenty weeks. [Id.]. The contract noted a "cemetery fee" of $100.00, a "net sale" of $1,870, sales tax of $126.23, a "total" of $1996.23, and a "discount" of $126.23. [Id.]. Under those amounts, "1,870" was written again, presumably the total after the discount was applied. [Id.]. Next to the cemetery fee amount, there was a handwritten notation reading "customer will pay." [Id.]. Under these monetary amounts, there was a handwritten notation that read "paid." [Id.]. The contract also included the standard disclaimer and was signed by McMahan. [Id.].

25

On February 15, 2019,[11] Custom Monuments prepared and sent an order form for the monument to Faith Customized Monuments. [Case No. 1:22cv32, Doc. 26-12: Faith Order Form]. Faith Customized Monuments sent Custom Monuments a proof for the design of the monument, and Ensley signed the proof on March 3, 2019. [Case No. 1:22cv32, Doc. 26-13: Signed Proof]. In March or April of 2019, someone from Custom Monuments[12] contacted Ensley and informed her that the monument was completed and in Custom Monuments' possession but that she needed to pay a cemetery fee to Fairview Cemetery before the monument could be installed. [Case No. 1:22cv32, Doc. 26-3: McMahan Dep. at 131]. A month later, McMahan again called Ensley to remind her to pay the cemetery fee and Ensley told McMahan that she "thought she'd already paid [the fee] to us." [Id. at 134]. McMahan informed her that she had not paid the fee to Custom Monuments and that she needed to pay the cemetery directly. [Id.]. At his deposition,

---

[11] The date on the order form reads "2/15/18"; however, that date precedes the contract date. [Doc. 26-12: Faith Order Form]. In his declaration, McMahan stated that the order form was prepared and submitted on February 15, 2019; accordingly, the date on the order form appears to be an error. [Case No. 1:22cv32, Doc. 26-10: McMahan Decl. at ¶ 4].

[12] At his deposition, McMahan could not recall who in particular contacted Ensley about the monuments but testified that he did not "remember talking to her directly." [Doc. 26-3: McMahan Dep. at 134].

McMahan testified that he spoke with Ensley "at least three or four" times about paying the cemetery fee.[13]  [Id. at 140].

On August 12, 2019, Ensley contacted the Henderson County Sheriff's Department and spoke with Deputy Owen.  [Case No. 1:22cv32, Doc. 24-3: Owen Dep. at 30].  Ensley informed Owen that over a year had passed since she paid $1,870 to Custom Monuments for a monument and that she had yet to receive the monument.  [Case No. 1:22cv32, Doc. 24-3: Investigation Rep. at 4].  Deputy Clamser called Ensley on August 28, 2019, to investigate Deputy Owen's initial report.   [Doc. 26-5: Clamser Dep. at 98].   Ensley informed Deputy Clamser that she had called Custom Monuments more than thirty times over the course of eighteen months and had received no return calls from McMahan.  [Case No. 1:22cv32, Doc. 24-3: Investigation Rep. at 4].  Deputy Clamser asked Ensley if she had received any excuse for the delay from McMahan or Custom Monuments and she responded that she had received emails from an employee "regarding the weather."  [Id.].

On August 29, 2019, Deputy Clamser testified before Magistrate Jernigan regarding Ensley's allegations.  [Case No. 1:22cv32, Doc. 24-4: Clamser Dep. at 99].  Deputy Clamser testified about Ensley's initial report

---

[13] The record does not reflect when exactly these contacts took place.

that she had not received a monument for which she had paid and testified about the information he learned when he called Ensley. [Case No. 1:22cv32, Doc. 24-4: Clamser Dep. at 123-24, 173]. Based on the information provided, Magistrate Jernigan issued an arrest warrant for McMahan, charging him with obtaining property by false pretenses in violation of North Carolina General Statute § 14-100. [Case No. 1:22cv32, Doc. 26-16: Arrest Warrant]. The warrant reads: "The false pretense consisted of the following: Victim purchased a grave stone/monument and it was never delivered nor money returned." [Id.].

On September 16, 2019, McMahan was arrested for the charge at issue in this case. [Id.]. At some point, McMahan contacted Fairview Cemetery to inquire whether he could install the monument prior to Ensley paying the required cemetery fee. [Id. at 134]. Fairview Cemetery agreed to allow installation after Ensley assured the cemetery she would mail the fee, and McMahan installed the monument. [Id.]. On September 11, 2020, after McMahan installed the monument, the charge at issue in this case was dismissed pursuant to an agreement arranged by McMahan's defense attorney. [Case No. 1:22cv32, Doc. 26-18: Dismissal Record; Case No. 1:22cv32, Doc. 24-5 McMahan Dep. at 141].

### F. Nancy Robinson (Case No. 1:22cv33)

On October 23, 2018, Custom Monuments entered into a contract with Nancy Robinson ("Robinson") to produce a gravestone monument. [Case No. 1:22cv33, Doc. 26-12: Robinson Contract at 2]. The contract provided an estimated completion time of sixteen to twenty weeks but included a notation next to that estimate that read "weather." [Id.]. The contract noted a "net sale" amount of $1,595, sales tax of $107.66, and a "total" of $1,702.66. [Id.]. Under these amounts, there was a stamp reading "paid." [Id.]. The contract also included the standard disclaimer and was signed by McMahan. [Id.].

"[S]ometime between October 12, 2018, and February 18, 2019," Custom Monuments prepared and sent an order form for the monument to Faith Customized Monuments. [Case No. 1:22cv33, Doc. 26-11: McMahan Decl. at ¶ 5; Doc. 26-13: Faith Order Form]. Faith Customized Monuments sent Custom Monuments a proof for the design of the monument, and Robinson signed the proof on March 14, 2019. [Case No. 1:22cv33, Doc. 26-15: Signed Proof]. In mid-July 2019, McMahan traveled to Georgia and retrieved the completed monument from Faith Customized Monuments. [Case No. 1:22cv33, Doc. 26-2: Plaintiff's Responses to Interrogatories at 2]. McMahan attempted to contact Robinson but was unable to speak with her due to her poor health. [Id.]. Eventually McMahan was able to speak with

one of Robinson's caregivers, who provided him with Robinson's daughter's phone number. [Id.]. McMahan then contacted Robinson's daughter, Sherri Pridmore ("Pridmore"), to inform her that the monument was ready.[14] [Id.].

On August 13, 2019, Pridmore contacted the Henderson County Sheriff's Department and spoke with Deputy Owen. [Case No. 1:22cv33, Doc. 24-3: Owen Dep. at 35]. Pridmore told Deputy Owen that her mother had ordered and paid for a monument that she had not received.[15] [Id.]. Pridmore also informed Deputy Owen that she was Robinson's power of attorney. [Id.]. Deputy Clamser instructed Deputy Pierce to follow up with Pridmore. [Case No. 1:22cv33, Doc. 24-4: Pierce Dep. at 39]. Deputy Clamser asked Deputy Pierce to ask Pridmore five specific questions. [Id.]. On September 3, 2019, Deputy Pierce called Pridmore and asked her the following questions as instructed: "(1) How many calls did you make to Custom Monuments?; (2) How many return calls/emails did you receive from Darryl McMahan?; (3) What was his excuse?; (4) What was your method of

---

[14] The record does not reflect exactly when McMahan spoke with Pridmore. In his Responses to the Defendants' Interrogatories, he states that this contact occurred prior to September 5, 2019. [Case No. 1:22cv33, Doc. 26-2: Plaintiff's Responses to Interrogatories at 2].

[15] In her deposition and in her report, Deputy Owen appears to misstate the date the contract was signed, stating that the monument was ordered on October 23, 2019, rather than 2018. [Case No. 1:22cv33, Doc. 24-3: Owen Dep. at 35; Case No. 1:22cv33, Doc. 24-3 Investigation Rep. at 5].

payment?; and (5) did he offer/ or make things right?" [Case No. 1:22cv33, Doc. 24-3: Investigation Rep. at 5-6]. Pridmore informed Deputy Pierce that she had called Custom Monuments ten times and visited the business four times but had received no return calls or emails. [Id.]. She also informed Pridmore that the excuses she had received were "weather" and "a sick father" and that she had been told once that the monument was ready but had yet to see the monument or receive it. [Id.].

Deputy Clamser reviewed Deputy Pierce's report of his call with Pridmore and, on September 5, 2019, testified before Magistrate Jernigan regarding Pridmore's allegations. [Case No. 1:22cv33, Doc. 24-5: Clamser Dep. at 123]. Deputy Clamser testified about Pridmore's initial report that her mother had not received a monument for which she had paid and testified about the information Deputy Pierce learned when he called Pridmore. [Id. at 123-24, 173]. Based on the information provided, Magistrate Jernigan issued an arrest warrant for McMahan, charging him with obtaining property by false pretenses in violation of North Carolina General Statute § 14-100. [Case No. 1:22cv33, Doc. 26-16: Arrest Warrant]. The warrant reads: "The false pretense consisted of the following: Victim purchased a grave stone/monument a[n]d it was never delivered nor money refunded." [Id.].

31

On September 16, 2019, McMahan was arrested for the charge at issue in this case. [Id.]. On August 8, 2020, McMahan met with Pridmore and installed the monument.[16] [Case No. 1:22cv33, Doc. 26-2: Plaintiff's Responses to Interrogatories at 2]. On August 14, 2020, the charge at issue in this case was dismissed pursuant to an agreement arranged by McMahan's defense attorney. [Case No. 1:22cv33, Doc. 26-18: Dismissal Record; Case No. 1:22cv33, Doc. 24-6 McMahan Dep. at 141].

## G.   Charles Lance (Case No. 1:22cv34)

On January 29, 2013, Custom Monuments (known at that time as McMahan Memorials) entered into a contract with Charles Lance ("Lance") to produce a gravestone monument. [Case No. 1:22cv34, Doc. 26-12: Lance Contract at 2]. The contract provided an estimated completion time of fourteen to sixteen weeks. [Id.]. The contract noted a "net sale" amount of $805, sales tax of $54.34, and a "total" of $859.34. [Id.]. Under these amounts, there was a stamp that read "paid." [Id.]. The contract also included the standard disclaimer and was signed by McMahan. [Id.].

---

[16] Pursuant to a condition of his pretrial release bond, McMahan could not speak with Pridmore until August 2020. [Case No. 1:22cv34, Doc. 26-2: Plaintiff's Responses to Interrogatories at 2].

On March 22, 2013, McMahan ordered the monument from Landmark Granite Company ("Landmark Granite"). [Case No. 1:22cv34,Doc. 26-13: Landmark Order Form]. McMahan picked up the completed monument in 2013 from Landmark Granite in Georgia. [Case No. 1:22cv34, Doc. 26-11: McMahan Decl. at ¶ 5]. After the monument was in, Lance saw the monument and requested that McMahan keep the monument until Lance's wife passed away. [Id. at ¶ 6]. At the time, Lance thought his wife's death was imminent due to an illness; however, Lance's wife lived for "another five or six years." [Id.]. McMahan stored the monument at his business during that time pursuant to Lance's request. [Id.].

On August 16, 2019, Lance contacted the Henderson County Sheriff's Department and spoke with Deputy Owen. [Case No. 1:22cv34, Doc. 24-3: Owen Dep. at 40]. Lance told Deputy Owen that he had purchased a monument from McMahan's company in January 2013 and had not received it. [Id.]. On August 30, 2019, Deputy Pierce called Lance to follow up on Deputy Owen's initial report. [Case No. 1:22cv34, Doc. 24-4: Pierce Dep. at 47]. Lance informed Deputy Pierce that he had seen the monument and had requested that McMahan store the monument. [Id. at 48]. Lance also told Deputy Pierce that he had called two different numbers for Custom Monuments to attempt to schedule a time to retrieve the monument. [Id.].

33

Lance stated that he had reached a voicemail recording when he called one of the numbers and that the other number was out of service. [Id. at 49].

Deputy Clamser and Deputy Pierce visited Custom Monuments to follow up on Lance's allegations[17] and reported that they did not see Lance's monument. [Case No. 1:22cv34, Doc. 24-5: Clamser Dep. at 118]. On September 5, 2019, Deputy Clamser testified before Magistrate Jernigan regarding Lance's allegations. [Id. at 114]. Deputy Clamser testified that Lance had purchased a monument from McMahan's company and had not received the monument. [Id. at 124]. Deputy Clamser did not tell Magistrate Jernigan that the monument had been completed and, at his deposition, testified that he could not remember whether he told Magistrate Jernigan that Lance had tried to call Custom Monuments and had not been able to reach anyone. [Id. at 114, 116]. Based on the information provided, Magistrate Jernigan issued an arrest warrant for McMahan, charging him with obtaining property by false pretenses in violation of North Carolina General Statute § 14-100. [Case No. 1:22cv34, Doc. 26-15: Arrest Warrant]. The warrant reads: "The false pretense consisted of the following: Victim purchased a

---

[17] It appears that at some point Lance told someone at the Sheriff's Department that he had visited Custom Monuments and had still been unable to locate his monument. [See Case No. 1:22cv34, Doc. 24-5: Clamser Dep. at 118]. It is unclear to whom he told that information.

34

grave stone/monument and [i]t was never delivered nor money refunded."
[Id.].

On September 16, 2019, McMahan was arrested for the charge at issue in this case.  [Id.].  On November 17, 2019, Lance's wife passed away and Lance contacted the Henderson County Sheriff's Department to report her passing and to request that the monument be installed.  The fact of Lance's wife's death and his request for installation were communicated to McMahan's attorney, and McMahan added the date of Lance's wife's death to the monument and installed the monument on August 8, 2020.[18] [Case No. 1:22cv34, Doc. 26-2: Plaintiff's Responses to Interrogatories at 2].  On August 14, 2020, the charge at issue in this case was dismissed pursuant to an agreement arranged by McMahan's defense attorney.   [Case No. 1:22cv34, Doc. 26-17: Dismissal Record; Case No. 1:22cv34,Doc. 24-6 McMahan Dep. at 141].

### H.    Christine McEntee (Case No. 1:22cv35)

---

[18] Pursuant to a condition of his pretrial release bond, McMahan could not speak with Lance until August 2020. [Doc. 26-2: Plaintiff's Responses to Interrogatories at 2].

On August 23, 2017, Custom Monuments entered into a contract with Christina McEntee ("McEntee") to produce a gravestone monument. [Case No. 1:22cv35, Doc. 26-11: McEntee Contract at 2]. The contract provided an estimate completion time of twelve to sixteen weeks. [Id.]. The contract noted a "cemetery fee" of 129.60, a "net sale" of 575.00, sales tax of $38.81, and a "total" of $743.41. [Id.]. Under these amounts, there was a stamp that read "paid." [Id.]. Next to these totals there was a handwritten notation reading "see cemetery for location." [Id.]. The contract also included the standard disclaimer and was signed by McMahan. [Id.].

On September 26, 2017, Custom Monuments received a quote for the monument from Global Values Inc. ("Global Values"), and on March 2, 2018, McEntee signed a proof for the design of the monument. [Case No. 1:22cv35, Doc. 26-12: Global Values Quote; Case No. 1:22cv35, Doc. 26-15: Signed Proof]. Global Values produced the monument and, sometime around August 2018, McMahan received the completed monument. [Case No. 1:22cv35, Doc. 26-2: Plaintiff's Responses to Interrogatories at 2]. McMahan then attempted to contact Green Hills Cemetery, where the monument was to be installed, to request that the cemetery manager mark the location for the grave so that McMahan could install the monument. [Case No. 1:22cv35, Doc. 26-3: McMahan Dep. at 162]. McMahan called

36

the cemetery manager and left messages but was never able to reach him. [Id.]. McMahan attempted to contact McEntee to inform her that he was having difficulty coordinating with the cemetery but was initially unable to reach her. [Case No. 1:22cv35, Doc. 26-2: Plaintiff's Responses to Interrogatories at 2]. At some point before September 5, 2019, McMahan was able to reach McEntee and inform her that the delay in installing her monument was due to his difficulties contacting the cemetery manager. [Id.].

By the time that McMahan was able to reach McEntee, however, she already had contacted the Henderson County Sheriff's Office. On August 8, 2019, McEntee met with Henderson County Sheriff's Deputy Jackie Burnette ("Deputy Burnette") and informed her that she had purchased a monument in 2017 that she had not received. [Case No. 1:22cv35, Doc. 24-3: Investigation Rep. at 4]. McEntee told Deputy Burnette that she had tried to contact McMahan without success. [Id.]. On September 3, 2019, Deputy Joseph Bilbrey ("Deputy Bilbrey") called McEntee to further investigate her initial report. [Id. at 5]. McEntee told Deputy Bilbrey that she had emailed Custom Monuments five to ten times and that while McMahan was initially responsive to her inquiries, he stopped responding to her after she signed the proof for the monument. [Id.]. She told Deputy Burnette that McMahan's

excuse for the delay in her receiving the monument was a "[d]elay from [a] supplier in Greenville."  [Id.].

Deputy Clamser reviewed the investigation reports and, on September 5, 2019, testified before Magistrate Jernigan regarding McEntee's allegations. [Case No. 1:22cv35, Doc. 24-4: Clamser Dep. at 123].  Deputy Clamser testified about McEntee's initial report that she had not received a monument for which she had paid and testified about the information Deputy Bilbrey learned when he called McEntee.  [Id. at 123-24, 173].  Based on the information provided, Magistrate Jernigan issued an arrest warrant for McMahan, charging him with obtaining property by false pretenses in violation of North Carolina General Statute § 14-100.  [Case No. 1:22cv35, Doc. 26-16: Arrest Warrant].   The warrant reads: "The false pretense consisted of the following: Victim purchased a grave stone/monument and it was never delivered nor money refunded."  [Id.].

On September 16, 2019, McMahan was arrested for the charge at issue in this case.  [Id.].  In August 2020, McMahan spoke with McEntee and, after the cemetery staff marked the gravesite location, installed the

38

monument.[19]   [Case No. 1:22cv35, Doc. 26-2: Plaintiff's Responses to Interrogatories at 2].   On September 11, 2020, the charge at issue in this case was dismissed pursuant to an agreement arranged by McMahan's defense attorney.  [Case No. 1:22cv35, Doc. 26-18: Dismissal Record; Case No. 1:22cv35, Doc. 24-5 McMahan Dep. at 141].

## I.    Robert Justus (Case No. 1:22cv36)

On July 21, 2008, Custom Monuments (then known as McMahan Memorials) entered into a contract with Robert Justus ("Justus") to produce a gravestone monument.  [Case No. 1:22cv36, Doc. 26-11: Justus Contract at 2].  The contract provided an estimated completion time of ten to twelve weeks, and the acronym "ASAP" was handwritten next to the completion time.  [Id.].  The contract noted "installation costs" of $496.00, a "net sale" amount of $1,085.00, sales tax of $74.00, and a "total" of $1,655.00.  [Id.].  The contract also included the standard disclaimer and was signed by McMahan.  [Id.].

On August 6, 2008, McMahan submitted an order to Landmark Granite for the monument.  [Case No. 1:22cv36, Doc. 26-13: Landmark Order Form

---

[19] Pursuant to a condition of his pretrial release bond, McMahan could not speak with McEntee until August 2020. [Civil No. 1:22cv36, Doc. 26-2: Plaintiff's Responses to Interrogatories at 2].

at 2; Case No. 1:22cv36, Doc. 26-14: Landmark Invoice at 2].  McMahan received the completed monument later that year.  [Case No. 1:22cv36, Doc. 26-3: McMahan Dep. at 167]. However, he did not install the monument or otherwise deliver it to Justus at that point because Justice had "requested us to hold onto it because he was going to have to pour a special concrete form to set the monument on so it would hold up over the grave."  [Id.].  Justus never contacted McMahan or his company to inform him that he had completed the concrete form, so McMahan held on to the monument for the next eleven years.  [Id.].

On August 13, 2019, Justus met with Henderson County Sheriff's Deputy Owen and informed her that he had purchased a monument from McMahan's company in 2008 and had yet to receive the monument. [Case No. 1:22cv36, Doc. 26-4: Investigation Rep. at 8].  Justus informed Deputy Owen that the monument was currently located at Custom Monuments. [Case No. 1:22cv36, Doc. 26-4: Owen Dep. at 46].  Justus did not inform Deputy Owen that he had asked McMahan to store the monument and had asked to install a concrete form prior to the installation of the monument.  [Id. at 47].

On December 4, 2019, Deputy Clamser testified before Magistrate Oates regarding Justus's allegations.  [Case No. 1:22cv36, Doc. 24-6: Oates

40

Dep. at 15]. Deputy Clamser testified that Justus had paid for the monument and that the monument was never delivered. [Id.]. According to Magistrate Oates, Clamser told her that Justus paid $ 1780 for a gravestone which was never delivered and that Justus had attempted to contact McMahan but was unable to do so. [Case No. 1:22cv36, Doc. 24-6 at 15]. Magistrate Oates also recalled that there were other victims who had paid for the monuments in full and the monuments were never delivered, and neither the victims nor the Sheriff's Office could get into contact with McMahan. [Id. at 23-24]. Based on the information provided, Magistrate Oates issued an arrest warrant for McMahan, charging him with obtaining property by false pretenses in violation of North Carolina General Statute § 14-100. [Case No. 1:22cv36, Doc. 26-16: Arrest Warrant]. The warrant reads: "The false pretense consisted of the following: purchased a monument/grave stone that was never delivered." [Id.].

On December 18, 2019, McMahan was arrested for the charge at issue in this case. [Id.]. In August 2020, McMahan spoke with Justus and showed him the completed monument.[20] [Case No. 1:22cv36, Doc. 26-2: Plaintiff's

_____

[20] Pursuant to a condition of his pretrial release bond, McMahan could not speak with Justus until July 2020. [Case No. 1:22cv36, Doc. 26-2: Plaintiff's Responses to Interrogatories at 2].

Responses to Interrogatories at 2]. Justus informed McMahan that he would contact McMahan when he had installed the concrete form. [Id.]. However, Justus has yet to install the form; accordingly, McMahan still has the monument. [Id.]. On August 14, 2020, the charge at issue in this case was dismissed pursuant to an agreement arranged by McMahan's defense attorney. [Case No. 1:22cv36, Doc. 26-17: Dismissal Record; Case No. 1:22cv36, Doc. 24-5 McMahan Dep. at 141].

### J. Mary E. Farrior (Case No. 1:22cv37)

On July 19, 2019, Custom Monuments entered into a contract with Mary Edna Farrior ("Farrior") to engrave lettering on a field rock. [Case No. 1:22cv37, Doc. 26-2: Plaintiff's Responses to Interrogatories at 2; Case No. 1:22cv37, Doc. 26-11: Farrior Contract at 2]. The contract provided an estimated completion date of August 9, 2019. [Case No. 1:22cv37, Doc. 26-11: Farrior Contract at 2]. The contract noted a "net sale" amount of $285.00, sales tax of $19.95, and a "total" of $304.95. [Id.]. The contract also included the standard disclaimer and was signed by one of McMahan's employees, Justin Baynard ("Baynard"). [Id.]. The contract indicated that the engraving was paid for by Laurie Kozar ("Kozar") by credit card. [Case No. 1:22cv37, Doc. 26-10: McMahan Decl. at ¶ 4].

42

Farrior was to provide the field rock to be engraved. [Case No. 1:22cv37, Doc. 26-3: McMahan Dep. at 170-71]. However, Baynard informed McMahan that Farrior never provided the rock. [Id. at 173]. Soon after Custom Monuments contracted with Farrior, McMahan was first arrested on his other charges of obtaining property by false pretenses. [Id. at 275-76]. Because of his arrest and other unrelated issues, McMahan then fell behind on his pending orders, including Farrior's. [Id. at 277].

On August 20, 2019, Kozar met with Deputy Owen and informed her that Farrior had used her credit card to order a monument from McMahan's company and had not received it. [Case No. 1:22cv37, Doc. 26-4: Owen Dep. at 51-52]. Kozar did not clarify that the contract was for an engraving, not a monument, and did not inform Deputy Owen that Farrior was supposed to provide the field rock. [Id. at 52]. Kozar gave Deputy Owen a copy of the contract and her credit card receipt. [Id.]. On December 4, 2019, Deputy Clamser testified before Magistrate Alexandria Stewart (now Reid) ("Magistrate Stewart") regarding Justus's allegations. [Case No. 1:22cv37, Doc. 24-6: Reid Dep. at 6]. Deputy Clamser testified as to the information in Owen's report but did not inform Magistrate Stewart that the contract was for an engraving. [Case No. 1:22cv37, Doc. 24-4: Clamser Dep. at 144]. Based on the information provided, Magistrate Stewart issued an arrest warrant for

43

McMahan, charging him with obtaining property by false pretenses in violation of North Carolina General Statute § 14-100. [Case No. 1:22cv37, Doc. 26-12: Arrest Warrant]. The warrant reads: "The false pretense consisted of the following: purchased a monument/grave stone that was never delivered." [Id.].

On December 18, 2019, McMahan was arrested for the charge at issue in this case. [Id.]. Kozar's credit card was refunded and Farrior hired another company to do the engraving. [Case No. 1:22cv37, Doc. 26-2: Plaintiff's Responses to Interrogatories at 2]. On November 17, 2020, the charge at issue in this case was dismissed pursuant to an agreement arranged by McMahan's defense attorney. [Case No. 1:22cv37, Doc. 26-13: Dismissal Record; Case No. 1:22cv37, Doc. 24-5 McMahan Dep. at 141].

## IV. DISCUSSION

The Complaint filed in each of these civil actions asserts seven causes of action: (1) a state law malicious prosecution claim against Deputy Clamser in his individual capacity; (2) a state law abuse of process claim against Deputy Clamser in his individual capacity; (3) state law claims for malicious prosecution and abuse of process based on a theory of respondeat superior against Sheriff Lowell S. Griffin in his official capacity; (4) a 42 U.S.C. § 1983 claim against Deputy Clamser in his individual capacity for wrongful arrest in

44

violation of his Fourth and Fourteenth Amendment rights; (5) a § 1983 claim against Sheriff Griffin in his official capacity alleging a custom and practice of Fourth Amendment violations; (6) a § 1983 claim against Sheriff Griffin in his official capacity alleging a failure to supervise causing Fourth Amendment violations; and (7) a state law claim of negligence against Sheriff Griffin in his official capacity. [Doc. 1-1]. The Defendants seek summary judgment on all claims. [Doc. 29].

## A. Section 1983 Claim Against Deputy Clamser in His Individual Capacity

The Federal Civil Rights Act, 42 U.S.C. § 1983, imposes civil liability upon any person who, under color of law, deprives another of rights secured by the Constitution and laws of the United States. 42 U.S.C. § 1983. To prevail on a § 1983 claim, the plaintiff has the burden of establishing (1) the deprivation of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation was committed under color of state law. Austin v. Paramount Parks, Inc., 195 F.3d 715, 727 (4th Cir. 1999).

"The Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable." Brooks v. City of Winston-Salem, 85 F.3d 178, 183 (4th Cir.1996). In each of the present cases, McMahan alleges that

Deputy Clamser violated his Fourth and Fourteenth Amendment rights by subjecting him to an unlawful seizure when he was arrested. Specifically, McMahan argues that he was seized pursuant to invalid warrants unsupported by probable cause in that, in each case, Deputy Clamser purposefully omitted certain facts that would have negated probable cause to believe that McMahan had committed the crime of obtaining property by false pretenses. The Defendants, on the other hand, argue that each charge and arrest were supported by probable cause, or, in the alternative, that Deputy Clamser is entitled to qualified immunity.

A plaintiff arguing that an officer's omissions rendered a warrant deficient must show that the officer acted "deliberately" or with "reckless disregard for the truth" in omitting material facts in seeking the warrant. Miller v. Prince George's County, 475 F.3d 621, 627 (4th Cir. 2007). An officer's "reckless disregard" with respect to omissions "can be established by evidence that a police officer 'failed to inform the judicial officer of facts [he] knew would negate probable cause.'" Id. (alteration in original) (quoting Beauchamp v. City of Noblesville, Inc., 320 F.3d 733, 743 (7th Cir. 2003)). "A plaintiff's 'allegations of negligence or innocent mistake' by a police officer will *not* provide a basis for a constitutional violation." Id. at 627-28 (emphasis in original) (quoting Franks v. Delaware, 438 U.S. 154, 171 (1978)).

"To violate the Constitution, the false statements or omissions must be 'material,' that is, 'necessary to the [neutral and disinterested magistrate's] finding of probable cause.'" Miller, 475 F.3d at 628 (alterations in original) (quoting Franks, 438 U.S. at 155-56). "To determine materiality, a court must . . . 'insert the facts recklessly omitted, and then determine whether or not the corrected warrant affidavit would establish probable cause.'" Id. (quoting Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000)).

"Probable cause is 'not a high bar.'" United States v. Jones, 952 F.3d 153, 158 (4th Cir. 2020) (quoting Dist. Of Columbia v. Wesby, 138 S. Ct. 577, 586-87)). Probable cause is determined by examining the "totality of the circumstances" and exists when the facts and circumstances within an officer's knowledge are "sufficient in themselves to convince a person of reasonable caution that an offense has been or is being committed." Gomez v. Atkins, 296 F.3d 253, 262 (4th Cir. 2002) (internal quotations omitted) (first quoting Taylor v. Waters, 81 F.3d 429, 434 (4th Cir. 1996); and then quoting Wadkins v. Arnold, 214 F.3d 535, 539 (4th Cir. 2000)). Probable cause is an "objective standard of probability that reasonable and prudent persons apply in everyday life" and "requires more than bare suspicion" but "less than that evidence necessary to convict." United States v. Gray, 137 F.3d 765, 769 (4th Cir. 1998).

"The probable-cause inquiry turns on two factors: 'the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct.'" Smith v. Munday, 848 F.3d 248, 253 (4th Cir. 2017) (quoting Graham v. Gagnon, 831 F.3d 176, 184 (4th Cir. 2016)). Officers, however, are not required to "exhaust every potentially exculpatory lead or resolve every doubt about a suspect's guilt before probable cause is established." Miller, 475 F.3d at 630 (internal quotations omitted) (quoting Torchinsky v. Siwinski, 942 F.2d 257, 264 (4th Cir. 1991)).

With this framework in mind, the Court will now examine each charge separately in order to determine whether there was probable cause to arrest McMahan on August 8, 2019, September 16, 2019, and December 18, 2019.

### 1. The August 8, 2019 Arrest

McMahan was arrested on August 8, 2019 for the charges stemming from transactions with the following customers: Susan Roberts (Case No. 1:22cv28); Irene McMinn (Case No. 1:22cv29); Wanda Payne (Case No. 1:22cv30); and Sherri Freeman (Case No. 1:22cv31). Because McMahan was seized based on four separate arrest warrants, if there is probable cause for any one of these charges, McMahan's § 1983 claim for an unlawful seizure fails as to each of these cases. See Wells v. Bonner, 45 F.3d 90, 95 (5th Cir. 1995) ("If there was probable cause for any of the charges made ...

then the arrest was supported by probable cause, and the claim for false arrest fails."). Nevertheless, for the sake of completion, the Court will conduct the probable cause analysis for each of these cases seriatim.

### a. Roberts (Case No. 1:22cv28)

With respect that the Roberts matter, McMahan argues that Deputy Clamser recklessly disregarded the truth when he failed to advise Magistrate Oates certain exculpatory facts, such as that the Roberts contract provided that a cemetery fee was to be paid by the customer; that the monument had been ordered; that Roberts had signed a proof; and that the monument had been completed. There is no forecast of evidence, however, that Deputy Clamser or anyone else at the Sheriff's Office was aware of Roberts having signed a proof of the monument that was to be ordered. As such, Deputy Clamser could not have been in "reckless disregard" for that which had not been discovered.[21] As for Deputy Clamser's omission of the cemetery fee and the monument's completion from his warrant application, he testified in his deposition that he did not consider these facts relevant because, in the end, Roberts had paid for a monument that she never received. In seeking

---

[21] Moreover, even if Deputy Clamser had been aware of any proof, the fact that McMahan had received a proposal from the fabricator does not tend to show that such monument/marker had been actually ordered or secured.

the warrant, Deputy Clamser advised the magistrate that Roberts had paid for the monument; that more than eight months later it had not been delivered; and that McMahan was being evasive as to whether it ever would be delivered.  He omitted the facts cited by McMahan because he saw them as *irrelevant* to the question of whether McMahan had obtained Roberts's payment for the gravestone via false pretenses.  As such, McMahan fails to show that the omission of these facts shows a reckless disregard for the truth.

McMahan argues that the inclusion of the facts concerning the cemetery fee and the completion of the monument would have negated probable cause.   Inclusion of these facts, however, would have changed nothing.  Deputy Clamser had no knowledge that the cemetery fee had not been paid.  As such, the mention of the cemetery fee would have been as superfluous as the inclusion of any other extraneous provision of the contract.  The evidence of the completion of the monument fares no better, given that McMahan was so evasive over a long period regarding the delivery of the monument for which Roberts had long ago paid.

Even if Deputy Clamser had included the fact that McMahan had taken some steps toward fulfillment of the contract, the totality of the circumstances would lead a reasonable person to conclude that there was probable cause

50

to believe that McMahan had obtained property by false pretenses. McMahan accepted Roberts's money, did not deliver the gravestone monument within the contracted-for time frame, and behaved evasively when questioned by Hall and Roberts about when they could expect the marker. These facts would lead a reasonable person to conclude that there was probable cause to believe that McMahan acted with intent to defraud Roberts when he entered into the contract because he never planned to actually deliver the stone.[22] The fact that a photo of the monument existed does little to negate probable cause because, considering the totality of the circumstances and viewing the photo in the context of McMahan's multiple excuses and delays, sending the photo to Hall and then refusing to answer questions about when the physical monument would be delivered could reasonably be construed as just another attempt by McMahan to stall and delay.

---

[22] In arguing that there was a lack of probable cause, McMahan cites that portion of § 14-100, which states that "[e]vidence of nonfulfillment of a contract obligation standing alone shall not establish the essential element of intent to defraud." [Doc. 33 at 7 (citing N.C. Gen. Stat. § 14-100)]. The facts known to the officers at the time of McMahan's August 8, 2019 arrest, however, went far beyond a mere nonfulfillment of a contract. The officers were aware that McMahan had made multiple excuses and would often not respond at all to Hall and Roberts. These circumstances give rise to probable cause that McMahan either never intended to deliver, or at least never intended to do so on the terms originally contracted.

Accordingly, the Court concludes that had the omitted facts been included in the application for an arrest warrant, probable cause would still have supported the issuance of the warrant.[23]  As probable cause supported the arrest with respect to the Roberts matter, McMahan was not unlawfully seized on August 8, 2019, and his § 1983 claim against Deputy Clamser in Case No. 1:22cv28 fails.

### b.    McMinn (Case No. 1:22cv29)

With respect to the McMinn matter, McMahan argues that Deputy Clamser recklessly disregarded the truth when he failed to tell Magistrate Jernigan that there was a problem with installing the monument at Shepherd's Memorial Park or that McMinn had already received a refund, thereby rendering the warrant deficient.  Critically, however, McMahan has failed to present a forecast of evidence from which a reasonable jury could conclude that either of these omissions was made because Deputy Clamser knew that the inclusion of such fact would defeat probable cause.  Indeed, even if the omitted facts had been conveyed to Magistrate Jernigan, probable

---

[23] McMahan also cites certain statements made by Magistrate Oates during her deposition that knowing certain omitted facts would have been "helpful" or "important" as evidence that the omitted facts would negate probable cause. [Doc. 34 at 4]. However, probable cause is an objective standard and the Court concludes that there was probable cause to issue the warrant even had the omitted facts been included.

cause would have still existed to believe that McMahan obtained property from McMinn through false pretenses, thereby rendering the omissions immaterial.

Including the omitted facts known to Deputy Clamser, the conduct known was that: McMinn paid for a gravestone marker that had not been delivered within the timeline anticipated by the contract; McMinn's money had been refunded, but only after multiple attempts to contact McMahan and after McMahan had been contacted by the police; and that dozens of McMahan's other customers had reported similar experiences. Accordingly, the Court concludes that had the omitted facts been included in the application for an arrest warrant, there still would have been probable cause to issue the warrant.[24] As probable cause supported the arrest, it was not an unlawful seizure. Accordingly, the Plaintiff's arrest cannot form the basis for a § 1983 claim as no violation of the Plaintiff's rights occurred. Therefore, the Court will grant summary judgment with respect to the § 1983 claim

---

[24] McMahan also cites certain statements made by Magistrate Jernigan during her deposition that she would have made a "different decision" had she known about the refund and a problem at Shepherd's Park. [Case No. 1:22cv29, Doc. 27 at 4-5]. However, probable cause is an objective standard, and the Court concludes that there was probable cause to issue the warrant even had the omitted facts been included. Moreover, Magistrate Jernigan herself admitted that a refund after the fact was not relevant to determining the existence of the intent to defraud at the time of the alleged crime. [Case No. 1:22cv29, Doc. 25-6: Jernigan Dep. at 44-45].

53

asserted against Deputy Clamser in his individual capacity in Case No. 1:22cv29.[25]

### c.    Payne (Case No. 1:22cv30)

With respect to the Payne matter, McMahan faults Deputy Clamser for failing to tell Magistrate McMurray that the contract was between Custom Monuments (not McMahan) and Payne and that Faith Customized Monuments allegedly had refused to engrave Payne's rock, thereby causing a delay in the process.  Neither of these facts, however, affects the probable cause analysis.  McMahan admits that no one from the Sheriff's Office knew about the issues with Faith Customized Monuments failing to engrave the field rock.  As such, Deputy Clamser cannot be held liable for omitting information that he did not know.  Further, Deputy Clamser was not constitutionally required to conduct an investigation into why the rock was not engraved in time prior to seeking a warrant.  See Miller, 475 F.3d at 630 (noting that officers are not required to "exhaust every potentially exculpatory

---

[25] The Court notes that because the other warrants served on August 8th were supported by probable cause, McMahan's arrest on that day was justified, regardless of the existence of probable cause for the McMinn matter.  As such, McMahan has failed to present a forecast of evidence that any failure in probable cause in the McMinn case was a proximate cause of any improper seizure on that date.  Accordingly, summary judgment is also granted on this basis.

lead or resolve every doubt about a suspect's guilt before probable cause is established") (citation and internal quotations omitted).[26]

The fact that Payne's contract was with Custom Monuments and not McMahan himself was also immaterial to the probable cause analysis. It is undisputed that McMahan met with Payne and agreed to perform the engraving; that he received payment from Payne; and that he failed to respond to her multiple attempts to contact him about the engraving. It is further undisputed that McMahan was the sole owner of Custom Monuments. This information would lead any officer to conclude there was probable cause to believe that McMahan had committed the offense of obtaining money through fraudulent pretenses. Accordingly, the Court will grant summary judgment with respect to the § 1983 claim asserted against Deputy Clamser in his individual capacity in Case No. 1:22cv30.

---

[26] A recurring theme in McMahan's arguments in each of these cases is that Deputy Clamser and the other deputies failed to undertake an adequate investigation, and had they done so they would have discovered facts that could negate probable cause. That argument, however, fails as a matter of law. Once a law enforcement officer has obtained sufficient information to establish probable cause, he has no further constitutional obligation to delay. He can proceed to obtain a warrant based on what he knows, provided it is sufficient. McMahan conflates the withholding of pertinent information the officer knows with the failure to discover information which the law enforcement officer does not know.

### d. Freeman (Case No. 1:22cv31)

With respect to the Freeman matter, McMahan argues that probable cause was lacking because no one from the Sheriff's Office had interviewed McMahan regarding the contract with Freeman. McMahan also faults Deputy Pierce for failing to ask Freeman any questions about her contract and for failing to review that contract. Additionally, McMahan complains that Deputy Clamser failed to tell the magistrate about the fact that McMahan and Freeman had exchanged images of Dachshund dogs to be included on the monument.

To the extent that McMahan takes issue with the scope of Deputy Clamser's investigation, these arguments are meritless. Deputy Clamser was not required to contact McMahan and interview him prior to seeking a warrant for his arrest, nor was Deputy Pierce required to ask particular questions of Freeman or review the details of the contract in the course of his investigation. See Miller, 475 F.3d at 630

As for Deputy Clamser's failure to advise the magistrate regarding the exchange of images, this information would not have negated a finding of probable cause. At the time Deputy Clamser went to Magistrate McMurray, he knew that Freeman had paid for two headstones over a year and a half earlier, had not received them, and had not been able to get into contact with

56

McMahan or anyone at Custom Monuments, despite over one hundred phone calls. This information would lead any reasonable officer to conclude there was probable cause to arrest McMahan for the offense of obtaining money through false pretenses.

In sum, the Court concludes that each of the arrest warrants served on McMahan on August 8, 2019 were adequately supported by probable cause. As such, the Court will grant summary judgment in favor of Deputy Clamser with respect to all of the § 1983 claims asserted against him in his individual capacity in Case Nos. 1:22cv28, 1:22cv29, 1:22cv30, and 1:22cv31.[27]

## 2. The September 16, 2019 Arrest

McMahan was arrested on September 16, 2019 for the charges stemming from the transactions with the following customers: Sheila Ensley (Case No. 1:22cv32); Nancy Robinson (Case No. 1:22cv33); Charles Lance (Case No. 1:22cv34); and Christine McEntee (Case No. 1:22cv35). If there

---

[27] Because McMahan has not presented a forecast of evidence that Deputy Clamser violated a constitutional right with respect to any of these cases, the Court concludes that Deputy Clamser is entitled to qualified immunity on McMahan's § 1983 claims against him in his individual capacity. At the bare minimum, there was at least arguable probable cause for each arrest, thereby entitling Deputy Clamser to qualified immunity. See Orem v. Gillmore, 813 F. App'x 90, 92-93 (4th Cir. 2020) (citing with approval Branch v. Gorman, 742 F.3d 1069, 1072 (8th Cir. 2014) ("Qualified immunity applies if there is ... arguable probable cause," which "exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is objectively reasonable")). As such, the Court grants summary judgment on this ground as well.

57

is probable cause for any one of these arrests, McMahan's § 1983 claims against Deputy Clamser fails with respect to all of these cases. <u>See Wilkerson v. Hester</u>, 114 F.Supp.2d 446, 456-57 (W.D.N.C. 2001).

### a. Ensley (Case No. 1:22cv32)

With respect to the Ensley matter, McMahan faults the Sheriff's Office for not following up with him about any of the circumstances of the contract with Ensley. McMahan further contends Magistrate Jernigan stated that the failure to pay a cemetery fee and the fact that a proof had been prepared may have been relevant to her determination of probable cause.

Probable cause to obtain the warrant still exists despite these contentions. Significantly, McMahan admits that Ensley did not tell the Sheriff's Office that 1) she signed a proof; 2) that the monument was built and ready to be installed; and 3) that she did not pay the cemetery fee. Deputy Clamser cannot be liable for omitting information which he did not know. Further, Deputy Clamser was not constitutionally required to contact McMahan for an explanation of his conduct prior to seeking a warrant in this case. While McMahan may be correct that additional investigation may have exonerated him, probable cause does not require an investigator to "exhaust every potentially exculpatory lead or resolve every doubt about a suspect's guilt before probable cause is established." <u>Miller</u>, 475 F.3d at 630.

What Ensley told Sheriff's Office, and what Deputy Clamser told the magistrate, was the following: 1) on July 28, 2018, she paid $1870 for a monument from Custom Monuments; 2) she had not received it despite it having an estimated completion date of sixteen to twenty weeks; and 3) she contacted Custom Monuments over thirty times over eighteen months, and received no phone calls from McMahan but only an email from a worker at Custom Monuments that weather was the cause for the delay. McMahan does not contest the veracity of Ensley's information, nor does he provide any evidence that Deputy Clamser knew or should have known about Ensley's failure to pay the cemetery fee or that she had received the proof.

The information provided to Deputy Clamser and subsequently conveyed to the magistrate[28] would lead any reasonable officer to conclude there was probable cause to arrest McMahan for the crime of obtaining property by false pretenses. Accordingly, the Court will grant summary judgment with respect to the § 1983 claim asserted against Deputy Clamser in his individual capacity in Case No. 1:22cv32.

---

[28] It should be noted that the magistrate who approved the warrant in this matter, Magistrate Jernigan, had also issued one of the warrants for the August 8th arrests and thus was already aware of at least part of what could be considered a common pattern or scheme of fraudulent conduct, a fact which further supported a finding of probable cause.

59

**b.    Robinson (Case No. 1:22cv33)**

With respect the Robinson matter, McMahan argues that he had the monument completed within the time frame of the estimate, but could not install it due to communication problems. He also complains that no one from the Sheriff's Office asked him about the circumstances of his contract with Robinson.

While McMahan argues that it would have been important for the magistrate to know if the headstone had been completed, McMahan admits that Pridmore, who had Nancy Robinson's power of attorney, did not inform Deputy Clamser or any of the other investigating officers that the proof of the monument had been finalized, or that the headstone had been completed. Again, Deputy Clamser cannot be held liable for omitting information that he did not know.  As for McMahan's assertion that Deputy Clamser should have informed the magistrate of "communication problems" causing the delay, he did provide testimony that McMahan did not return Pridmore's many calls.

At the time that Deputy Clamser sought the warrant, he knew that Robinson had contracted for a headstone and had paid money to McMahan; that Robinson's power of attorney, Pridmore, attempted to reach McMahan several times without success; and that Robinson still did not have the monument.  This information would lead any reasonable officer to conclude

60

that there was probable cause in this case. Accordingly, the Court will grant summary judgment with respect to the § 1983 claim asserted against Deputy Clamser in his individual capacity in Case No. 1:22cv33.

### c. Lance (Case No. 1:22cv34)

With respect to the Lance matter, McMahan again complains that no one from the Sheriff's Office asked him about any of the circumstances of his company's contract with Lance. McMahan also contends that Deputy Clamser failed to advise Magistrate Jernigan that Lance's monument was completed, or that Lance asked McMahan to hold on to it, both of which would have been critical to her determination of probable cause. [Document 26, pp. 4-5].

These arguments, however, are without merit. While Deputy Clamser could not recall whether he told the magistrate that Lance's monument was complete and that Lance asked McMahan to hold on to it, even if Deputy Clamser had provided this information, there would still be probable cause. By the time Deputy Clamser applied for the warrant, he knew that Lance had signed the contract with McMahan more than six years earlier; that Lance had tried to contact McMahan without success; and that Lance had gone to McMahan's business location and could not find the monument. Deputy Pierce and Deputy Clamser also went by the business and could not locate

61

it. Certainly, any reasonable officer could believe that McMahan absconded with the money and did not provide the monument. The information that Deputy Clamser had would lead any reasonable officer to conclude there was probable cause to believe that McMahan had obtained property by false pretenses.[29] Therefore, the Court will grant summary judgment with respect to the § 1983 claim asserted against Deputy Clamser in his individual capacity in Case No. 1:22cv34.

### d. McEntee (Case No. 1:22cv35)

Once again, McMahan complains that no one from the Sheriff's Office asked him about the circumstances of his contract with McEntee, or about the causes of his admitted delay in completing the contract. McMahan also complains that the magistrate was not told that the monument had been completed or that McMahan had been having difficult contacting anyone at Green Hills Cemetery regarding installation. He further argues that Deputy

---

[29] The Court notes that the magistrate who approved the warrant in this matter, Magistrate Jernigan, previously had issued at least two other warrants for McMahan on related matters and thus had knowledge of the cumulative evidence of what appeared to be a common pattern or scheme of fraudulent conduct, a fact which further supported a finding of probable cause. The Court further notes that because the other warrants served on September 16th were supported by probable cause, McMahan's arrest on that day was justified, regardless of the existence of probable cause for the Lance matter. As such, McMahan has failed to present a forecast of evidence that any failure in probable cause in the Lance case was a proximate cause of any improper seizure on that date. Accordingly, summary judgment is also granted on this basis.

Clamser's investigation was inadequate because he failed to examine Custom Monuments' records.

With respect to the information not provided to the magistrate, McMahan candidly admits that McEntee did not inform the investigating deputies this information. Deputy Clamser can only be held responsible for omitting information to the magistrate that he knew about at the time he applied for the warrant. Further, while McMahan criticizes Deputy Clamser for not interviewing him or reviewing Custom Monuments' records prior to seek an arrest warrant, Deputy Clamser was not constitutionally required to do so.

Based on his investigation, Deputy Clamser told Magistrate Jernigan that McEntee had purchased a monument almost two years earlier, that she had no contact with McMahan after signing a proof on March 2, 2018; and that she was unsuccessful in contacting him after that. This information would lead any reasonable officer to conclude there was probable cause to believe that McMahan had committed the offense of obtaining property by false pretenses. Therefore, the Court will grant summary judgment with respect to the § 1983 claim asserted against Deputy Clamser in his individual capacity in Case No. 1:22cv35.

63

In sum, the Court concludes that each of the arrest warrants served on McMahan on September 16, 2019 were adequately supported by probable cause. As such, the Court will grant summary judgment in favor of Deputy Clamser with respect to all of the § 1983 claims asserted against him in his individual capacity in Case Nos. 1:22cv32, 1:22cv33, 1:22cv34, and 1:22cv35.[30]

### 3. The December 18, 2019 Arrest

McMahan was arrested on December 18, 2019 for the charges stemming from the transactions with the following customers: Robert Justus (Case No. 1:22cv36) and Mary E. Farrior (Case No. 1:22cv37). If there is probable cause for either one of these arrests, McMahan's § 1983 claim against Deputy Clamser fails with respect to both cases. See Wilkerson, 114 F.Supp.2d at 456-57.

---

[30] Because McMahan has not presented a forecast of evidence that Deputy Clamser violated a constitutional right with respect to any of these cases, the Court concludes that Deputy Clamser is entitled to qualified immunity on McMahan's § 1983 claims against him in his individual capacity. At the bare minimum, there was at least arguable probable cause for each arrest, thereby entitling Deputy Clamser to qualified immunity. See Orem, 813 F. App'x at 92-93. As such, the Court grants summary judgment on this ground as well.

### a. Justus (Case No. 1:22cv36)

With respect to the Justus matter, McMahan again complains that no one from the Sheriff's Office asked him about the circumstances of the contract with Justus or the history of his monument sales business He also complains that Deputy Clamser did not tell the magistrate that Justus had agreed to install a concrete foundation at his own expense or that the foundation needed to be completed before the monument could be placed at the cemetery.

As noted previously, Deputy Clamser was not required to interview McMahan prior to seeking an arrest warrant. As for the information not provided to the magistrate, it is undisputed that Justus did not supply Deputy Clamser with this information. Deputy Clamser cannot be held liable for failing to disclose information that he did not know.

When Deputy Clamser went to Magistrate Oates, he advised her that Justus purchased a monument eleven years earlier and had not yet received it. Magistrate Oates also recalled that there were other victims who had paid for the monuments in full but had not received them. Based on the information provided, as well as the magistrate's knowledge of the existence of other victims, there was probable cause for this warrant. Therefore, the

Court will grant summary judgment with respect to the § 1983 claim asserted against Deputy Clamser in his individual capacity in Case No. 1:22cv36.

### b. Farrior (Case No. 1:22cv37)

With respect to the Farrior matter, McMahan argues that Deputy Owen did not attempt to contact him about this contract and that Deputy Clamser did not tell the magistrate that the contract at issue was for an engraving of a field rock that had never been provided. He further argues that the complainant, Kozar, did not provide the Sheriff's Office with any information to indicate that the contract was made by McMahan instead of by his company, and that Deputy Owen did not attempt to contact Justin Baynard, the employee who had signed the contract, regarding the transaction.

As with so many of the other cases, McMahan's argument that the investigating deputies should have contacted him (or his employee) before seeking an arrest warrant in this case fails. As for Deputy Clamser's failure to advise the magistrate that the contract at issue was for an engraving of a field rock that had never been provided, it is undisputed that Kozar did not tell anyone at the Sheriff's Office that she had not provided a field rock to Custom Monuments. Deputy Clamser simply cannot be held liable for failing transmit information that he simply did not know. Further, it is not material that the contract was made with Custom Monuments, as the undisputed facts

66

show that McMahan was the sole proprietor of Custom Monuments. The information that Deputy Clamser had and conveyed to the magistrate would lead any officer to conclude there was probable cause to believe that McMahan had committed the offense of obtaining property by false pretenses. Therefore, the Court will grant summary judgment with respect to the § 1983 claim asserted against Deputy Clamser in his individual capacity in Case No. 1:22cv37.[31]

## B.  Section 1983 Claims Against Deputy Clamser in His Official Capacity

The Defendants also seek summary judgment on all claims against Deputy Clamser in his official capacity on the grounds that such claims would be redundant of official capacity claims against Sheriff Griffin.

While McMahan named Deputy Clamser in both his official and individual capacity in the Complaint, it is not clear that McMahan actually asserted any causes of action against Deputy Clamser in his official capacity. However, to the extent such official capacity claims were asserted against

---

[31] Because McMahan has not presented a forecast of evidence that Deputy Clamser violated a constitutional right with respect to either of these cases, the Court concludes that Deputy Clamser is entitled to qualified immunity on McMahan's § 1983 claims against him in his individual capacity. At the bare minimum, there was at least arguable probable cause for each arrest, thereby entitling Deputy Clamser to qualified immunity. See Orem, 813 F. App'x at 92-93. As such, the Court grants summary judgment on this ground as well.

Deputy Clamser, a claim against a sheriff deputy in his official capacity is akin to a suit against the office of sheriff itself. See Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 690 (1978) (stating that official capacity claims "represent only another way of pleading an action against an entity of which an officer is an agent"). Because McMahan has brought cognizable official capacity claims against Sheriff Griffin, the official capacity claims against Deputy Clamser (to the extent that any such claims are actually pled) are redundant and will be dismissed.

## C. Section 1983 Claims Against Sheriff Griffin in His Official Capacity

McMahan also asserts § 1983 claims against Sheriff Griffin in his official capacity, arguing that Sheriff Griffin failed to train his deputies on how to properly conduct criminal investigation and that the practice of obtaining warrants without probable cause was persistent and widespread. He further contends that Sheriff Griffin failed to adequately supervise Deputy Clamser and other employees regarding their investigative work and procurement of felony criminal charges.

Suits against sheriffs in their official capacity are in substance claims against the office of the sheriff itself. Gannt v. Whitaker, 203 F.Supp.2d 503, 508 (M.D.N.C. Feb. 26, 2002). To succeed on such a claim, McMahan must

68

allege that a Sheriff's Office policy or custom resulted in the violation of federal law.  See Monell, 436 U.S. at 694 (1978) (holding that in an official capacity suit, the entity's "policy or custom" must have played a part in the violation of federal law); City of Oklahoma City v. Tuttle, 471 U.S. 808, 818-20 (1985) (discussing same).   The Fourth Circuit has held that "[t]he substantive requirements for proof of municipal liability are stringent." Jordan by Jordan v. Jackson, 15 F.3d 333, 338 (4th Cir. 1994).

A municipal policy or custom may arise through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."  Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (citation omitted).  "Custom and usage . . . may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." Spell v. McDaniel, 824 F.2d 1380, 1387 (4th Cir. 1987).

A failure to supervise generally gives rise to § 1983 liability only in those situations in which there is a history of widespread abuse.  See Wellington v. Daniels, 717 F.2d 932, 936 (4th Cir. 1983).  As the Fourth Circuit stated in Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1991), a failure to supervise gives rise to § 1983 liability when: (1) the supervisor had actual

69

or constructive knowledge that subordinates were engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens; (2) the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) there was an "affirmative causal link" between the supervisor's inaction and the plaintiff's injury. While Shaw involved a supervisory liability claim against an individual, the same deliberate difference standard applies in failure to supervise claims against municipalities. Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 453 (5th Cir. 1994).

Here, McMahan has presented no forecast of evidence, outside of his own arrests, to show that there is pattern of misconduct sufficient to establish "custom and usage." See Shortz v. City of Montgomery, 267 F.Supp.2d 1124, 1129 (M.D. Al. 2003) (holding that plaintiff's citation to "his own arrest does not, by itself, show that there is a policy"). McMahan appears to argue that his numerous arrests themselves constitute evidence of a widespread policy of arresting people without probable cause. While McMahan was charged separately for each allegedly fraudulent customer transaction, these charges arose in a relatively short period of time and were essentially the result of a single investigation, led by Deputy Clamser. Even if McMahan

70

or constructive knowledge that subordinates were engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens; (2) the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) there was an "affirmative causal link" between the supervisor's inaction and the plaintiff's injury. While Shaw involved a supervisory liability claim against an individual, the same deliberate difference standard applies in failure to supervise claims against municipalities. Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 453 (5th Cir. 1994).

Here, McMahan has presented no forecast of evidence, outside of his own arrests, to show that there is pattern of misconduct sufficient to establish "custom and usage." See Shortz v. City of Montgomery, 267 F.Supp.2d 1124, 1129 (M.D. Al. 2003) (holding that plaintiff's citation to "his own arrest does not, by itself, show that there is a policy"). McMahan appears to argue that his numerous arrests themselves constitute evidence of a widespread policy of arresting people without probable cause. While McMahan was charged separately for each allegedly fraudulent customer transaction, these charges arose in a relatively short period of time and were essentially the result of a single investigation, led by Deputy Clamser. Even if McMahan

70

could show that these arrests were not supported by probable cause (which he has failed to do), one faulty investigation would not establish a widespread custom or policy sufficient to establish § 1983 liability on the part of the Sheriff.

In any event, as the Court previously concluded that no underlying civil rights violation occurred when McMahan was arrested for the charges in the Roberts matter, there can be no liability for Sheriff Griffin in his official capacity. See Waybright v. Frederick County, 528 F.3d 199, 203 (4th Cir. 2008) ("[S]upervisors and municipalities cannot be liable under § 1983 without some predicate 'constitutional injury at the hands of the individual [police] officer,' at least in suits for damages." (quoting City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986))). Accordingly, McMahan's § 1983 claims against Sheriff Griffin in his official capacity are dismissed.

### D.    Malicious Prosecution

McMahan also asserts claims under North Carolina law for malicious prosecution against Deputy Clamser and Sheriff Griffin, the latter of whom McMahan argues is liable under a theory of respondeat superior. [Doc. 1-1 at ¶¶ 32-41, 52-56]. Under North Carolina law, the elements of a claim for malicious prosecution are that the defendant: "(1) instituted, procured or participated in the criminal proceeding against [the] plaintiff; (2) without

probable cause; (3) with malice; and (4) the prior proceeding terminated in favor of [the] plaintiff." <u>Moore v. Evans</u>, 124 N.C. App. 35, 42, 476 S.E.2d 415, 421 (1996) (alterations in original) (internal quotations omitted) (quoting <u>Williams v. Kuppenheimer Mfg. Co.</u>, 105 N.C. App. 198, 200, 412 S.E.2d 897, 899 (1992)).

Here, the Court has concluded that there was probable cause to issue a warrant for McMahan's arrest and charge him with obtaining property by false pretenses in each of these civil actions. In addition, McMahan has presented no forecast of evidence from which an inference of malice can be drawn. Even if Deputy Clamser had been mistaken as to his understanding of probable cause, that would not indicate that his actions were malicious. Accordingly, McMahan cannot sustain claims for malicious prosecution, and the Court will grant summary judgment for the Defendants on the malicious prosecution claims against Deputy Clamser and Sheriff Griffin.

### E. Abuse of Process

McMahan also asserts state law claims for abuse of process against Deputy Clamser and Sheriff Griffin. [Doc. 1-1 at ¶¶ 42-56]. Under North Carolina law, "the only essential elements of abuse of process are: First, the existence of an ulterior purpose and, second, an act in the use of the process not proper in the regular prosecution of the proceeding." <u>Barnette v. Woody</u>,

242 N.C. 424, 431, 88 S.E.2d 223, 227-28 (1955). "The distinction between an action for malicious prosecution and one for abuse of process is that malicious prosecution is based upon malice in causing the process to issue, while abuse of process lies for its improper use after it has been issued." Id., 88 S.E.2d at 227.

Here, McMahan argues that "[a] long unexplained passage of time before dismissal, despite evidence of innocence, may lead to a plausible inference that the defendants took wrongful action to keep the charges active," [Doc. 33 at 5], relying on Scott v. City of Durham, No. 1:20-CV-558, 2021 WL 3856168, at *2 (M.D.N.C. Aug. 27, 2021). Unlike the situation in Scott, McMahan's charges in the present case were dismissed pursuant to a global agreement worked out by McMahan's counsel with prosecutors in an effort to resolve all of the charges pending against McMahan. There is no evidence of an unreasonable delay, and no inference of ulterior motive can be drawn from such evidence.[32]

---

[32] It should be noted that Scott came before the court in the context of a motion for judgment on the pleadings. Scott, 2021 WL 3856168, at *2. Here, the Court has the benefit of full forecasts of evidence, and such forecasts fail to show that any defendant took wrongful action to keep McMahan's charges active.

73

Accordingly, without more, the time elapsed between McMahan's arrests and the dismissal of his charges is insufficient for a reasonable factfinder to conclude that an abuse of process had occurred. The Court will therefore grant summary judgment in favor of the Defendants on the abuse of process claims.

## F.    Negligence

In his final cause of action, McMahan asserts a claim of "negligence by [Deputy] Clamser" that is "imputed to" Sheriff Griffin under the theory of respondeat superior. [Doc. 1-1 at ¶¶ 79-85]. The Defendants do not challenge the factual allegations underlying McMahan's negligence claim. Instead, they make two purely legal arguments: (1) Deputy Clamser is entitled to public official immunity and (2) McMahan failed to sue Western Surety as surety on the Sheriff's bond as required by N.C. Gen. Stat. § 58-76-5.

To the extent that McMahan attempts to assert negligence claims against Deputy Clamser in his individual capacity, such claims are barred by the doctrine of public official immunity. See Hare v. Butler, 99 N.C. App. 693, 700, 394 S.E.2d 231, 236 (1990) ("A public officer sued individually is normally immune from liability for 'mere negligence.'").

74

To the extent that McMahan seeks recovery against Sheriff Griffin for Deputy Clamser's alleged acts of negligence, such claims are barred by the doctrine of governmental immunity, absent a waiver of such immunity. See Knibbs v. Momphard, 30 F.4th 200, 229 (4th Cir. 2022) (quoting Greene v. Barrick, 198 N.C. App. 647, 651, 680 S.E.2d 727, 730-31 (2009)). Under North Carolina law, a sheriff may waive his governmental immunity from suits for damages caused by an employee's negligent conduct either by purchasing liability insurance or by purchasing a surety bond, but only to the extent of such insurance coverage or bond. Knibbs, 30 F.4th at 229.

Here, Henderson County purchased liability insurance through the North Carolina Association of County Commissioners for the relevant time period. [Doc. 30-2: Calloway Decl. at ¶¶ 2-3]. Such policy, however, explicitly excluded coverage for claims where the "Covered Person may assert sovereign and/or governmental immunity in accordance with North Carolina law." [Doc. 30-3 at 63, 108, 120; Doc. 30-4 at 66, 109, 120]. "[A] county does not waive governmental immunity '[i]f the liability policy, by its plain terms, does not provide coverage for the alleged acts.'" Id. at 229-30 (alteration in original) (quoting Ballard v. Shelley, 257 N.C. App. 561, 565, 811 S.E.2d 603. 606 (2018)). Accordingly, Henderson County's liability insurance does not provide coverage for the acts at issue in this case and,

therefore, governmental immunity was not waived by the purchase of liability insurance. See Knibbs, 30 F.4th at 230 (concluding that an analogous policy did not operate as a waiver of governmental immunity).

As for the surety bond, North Carolina law requires all sheriffs to purchase a surety bond, not to exceed $25,000. See N.C. Gen. Stat. 162-8. This surety bond "renders the sheriff and his sureties liable for all acts done by the sheriff by virtue or under color of his office to every person injured by the neglect, misconduct, or misbehavior" of the sheriff. Knibbs, 30 F.4th at 230 (quotation marks and alterations omitted) (quoting in part N.C. Gen. Stat. § 58-76-5). "Liability under the bond also extends to the acts of a sheriff's deputy, for '[t]he acts of the deputy are acts of the sheriff.'" Id. (alteration in original) (quoting Styers v. Forsyth County, 212 N.C. 558, 564, 194 S.E. 305, 308 (1937)). "Purchasing a sheriff's bond as required by N.C. Gen. Stat. § 162-8 waives the sheriff's governmental immunity, but only 'to the extent of the coverage provided.'" Butterfield v. Gray, 279 N.C. App. 549, 559, 866 S.E.2d 296, 304 (2021) (quoting White v. Cochran, 229 N.C. App. 183, 190, 748 S.E.2d 334, 339 (2013)).

The Defendants argue that McMahan's negligence claims must be dismissed because he failed to sue Sheriff Griffin's surety, Western Surety, under N.C. Gen. Stat. 58-76-5. That statute provides as follows:

> Every person injured by the neglect, misconduct, or
> misbehavior in office of any register, surveyor,
> sheriff, coroner, county treasurer, or other officer,
> may institute a suit or suits against said officer or any
> of them and their sureties upon their respective
> bonds for the due performance of their duties in office
> in the name of the State, without any assignment
> thereof; and no such bond shall become void upon
> the first recovery, or if judgment is given for the
> defendant, but may be put in suit and prosecuted
> from time to time until the whole penalty is recovered;
> and every such officer and the sureties on the
> officer's official bond shall be liable to the person
> injured for all acts done by said officer by virtue or
> under color of that officer's office.

N.C. Gen. Stat. § 58-76-5.

Here, McMahan has named Western Surety as a defendant and made specific allegations that the Sheriff's governmental immunity was "waived by the Sheriff's surety bond…." [Doc. 1-1 at ¶ 84]. While McMahan did not assert a separate claim "on the bond" against Western Surety, the naming of the surety as a defendant and the inclusion of allegations regarding the waiver of governmental immunity based on the bond's purchase are sufficient to state a claim against a surety under § 58-76-5. See Efird v. Riley, 342 F.Supp.2d 413, 425-26 (M.D.N.C. 2004) (noting that to recover on surety bond, North Carolina courts require the joinder of the bond surety as a party to the action and allegations of waiver based on purchase of bond).

77

For all of these reasons, the Court concludes that Sheriff Griffin has waived governmental immunity to the extent of the surety bond. Therefore, the Court will deny summary judgment as to Western Surety and Sheriff Griffin for the negligence claims asserted by McMahan.

As McMahan's negligence claims are the sole claims remaining in these civil actions, the Court will next address the propriety of exercising supplemental jurisdiction over these state law claims.

Where federal district courts have proper original jurisdiction over a claim, they may exert "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy," 28 U.S.C. § 1367, "deriv[ing] from a common nucleus of operative fact . . . such that [the plaintiff] would ordinarily be expected to try them all in one judicial proceeding." United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 724 (1966). In deciding whether to exert supplemental jurisdiction, the Court must "consider and weigh in each case, and at every stage of litigation, the values of judicial economy, convenience, fairness, and comity." City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997).

Here, if McMahan were to succeed on his remaining claims of negligence, he could recover to the extent of the sheriff's bond. However, it

78

is unclear whether North Carolina courts would permit McMahan to recover the maximum amount of the surety bond in each of these civil actions or if his recovery would be limited to $25,000 in the aggregate. See Morgan v. Spivey, No. 5:16-CV-365-FL, 2017 WL 4399539, at *8 (E.D.N.C. Sep. 29, 2017) (noting that "Plaintiff offers no example, and the court has found none, where North Carolina courts have allowed recovery in excess or in multiples of the amount of a sheriff's bond"). This appears to be a novel issue of North Carolina law that is better addressed by the North Carolina courts in the first instance. For this reason, the Court will decline supplemental jurisdiction on McMahan's negligence claims. See 28 U.S.C. § 1367(c)(1) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if the claim raises a novel or complex issue of State law."). Therefore, the Court remands McMahan's negligence claims as asserted in each of these ten civil actions to the Buncombe County General Court of Justice, Superior Court Division.

# O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendants' Motions for Summary Judgment [Case Nos. 1:22-cv-00028-MR-WCM, Doc. 29; 1:22-cv-00029-MR-WCM, Doc. 24; 1:22-cv-00030-MR-WCM, Doc. 24; 1:22-cv-

00031-MR-WCM, Doc. 23;  1:22-cv-00032-MR-WCM, Doc. 23;  1:22-cv-00033-MR-WCM, Doc. 23;  1:22-cv-00034-MR-WCM, Doc. 23;  1:22-cv-00035-MR-WCM, Doc. 23;  1:22-cv-00036-MR-WCM, Doc. 23; 1:22-cv-00037-MR-WCM, Doc. 23] are **GRANTED IN PART AND DENIED IN PART** as follows: (1) the Motions are **GRANTED** as to the Plaintiff's claims pursuant to 42 U.S.C. § 1983, his claims under North Carolina law for malicious prosecution and abuse of process, and his claims for negligence against Deputy Clamser; and (2) the Motions are **DENIED** as to Western Surety Company and Sheriff Griffin for the negligence claims asserted against Sheriff Griffin.

**IT IS FURTHER ORDERED** that these actions are **REMANDED** to the Buncombe County General Court of Justice, Superior Court Division, for further proceedings with respect to the Plaintiff's negligence claims asserted against Sheriff Griffin.

**IT IS SO ORDERED.**

Signed: August 17, 2023

Martin Reidinger
Chief United States District Judge